UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Terry Teachout,                                                   Civil No. 09-2140 (DWF/JSM)

            Plaintiff,

v.                                                        **MEMORANDUM**
                                                             **OPINION AND ORDER**

University of Minnesota,

            Defendant.

_____

Judith K. Schermer, Esq., Judith K. Schermer PLLC, counsel for Plaintiff.

Brian J. Slovut, Esq., University of Minnesota, counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant University of Minnesota. (Doc. No. 9.) For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

This matter involves Plaintiff Terry Teachout's assertions that he was terminated from his position at the University of Minnesota in retaliation for requesting a disability accommodation and for reporting alleged violations of the law. Teachout's Complaint

sets forth two counts[1]: (1) disability discrimination in violation of the Minnesota Human Rights Act ("MHRA") and Americans with Disability Act ("ADA"); and (2) a whistleblower claim brought pursuant to the Minnesota Whistleblower Act, Minn. Stat. § 181.932, subd. 1, *et seq.*

**Teachout's Employment History with Risk Management**

Teachout worked at the University of Minnesota from 1993 to 2008. (Teachout Dep. at 7.) During that time period, he worked in the area of workers' compensation for the Office of Risk Management and Insurance ("Risk Management"). (*Id.*) Risk Management is part of the Controller's Office, charged with protecting the assets of the University from loss or damage that could affect overall financial stability. (Pardoe Aff. ¶ 3.) Specifically, Risk Management assesses how to best finance the University's risk by either retaining risks and self-insuring, or by transferring risks by paying commercial insurers to pay possible losses. (*Id.* ¶ 4.)

Prior to the department's restructuring in 2008, Risk Management was comprised of a Director, an administrative assistant, and two employees who worked exclusively in workers' compensation—Teachout, who managed worker's compensation, and another individual who provided administrative support in workers' compensation. (*Id.* ¶ 7.) A third party administrator—Sedgwick Claims Management—administered workers' compensation claims. (Volna Dep. at 35.)

---

[1] The Complaint initially included Count 2, Age Discrimination under the MHRA and the Age Discrimination in Employment Act, but Teachout agreed to voluntarily dismiss this Count. (Teachout Dep. at 6.)

In March 2007, Cary Jones, the Director of Risk Management was terminated from his position with the University and the department was left without someone with a broad background in insurance to replace him. (Teachout Dep. at 16; Volna Dep. at 85.) In January 2006, prior to Jones' departure, Jones discussed re-organizing Risk Management by reducing the number of staff members dedicated to workers' compensation issues. (Slovut Aff. ¶ 6, Ex. E.)

After Jones left, Michael Volna, the Controller, oversaw the Risk Management department. (Volna Dep. at 8.) Denise Seck, Associate Controller, also had an oversight role over the department while the University sought a new director. (Volna Dep. at 25; Seck Dep. at 6-7.)

At some point, Arther J. Gallagher Risk Management Services ("Gallagher") was asked to perform an analysis of the Risk Management department. (Seck Dep. at 17.) According to Seck, Gallagher spent "extensive time" with many individuals in the risk management department and with individuals served by that department. (*Id.*) Gallagher was asked to provide feedback on their assessment. (*Id.*) Teachout testified that John McLaughlin and Mary Wells of Gallagher interviewed him during their evaluation of the department. (Teachout Dep. at 19-20.) Mary Wells also conducted file reviews involving workers' compensation. (*Id.* at 20.)

Volna and Seck testified that during their time overseeing the department, they had concerns regarding duplication between Teachout's work and that of Sedgwick. (Volna Dep. at 47-8; Seck Dep. at 30.) In fact, Teachout testified that he reviewed each of the approximately 900 claims filed each year and the associated medical records

3

before they were sent to Sedgwick.  (Teachout Dep. 165-66.)  Also, Volna testified that when he was supervising the department, he decided that Risk Management needed to be physically located near where the new director would be housed so that the new director could oversee and manage the staff.  (Volna Dep. at 52.)  As a result, Teachout's office was moved from a closed area on the sixth floor of the building in which Risk Management was housed to an open cubicle on the second floor of the building.  (Volna Dep. at 27.)

In March 2008, Volna and Seck directed Gallagher to observe a number of employees in order for Gallagher to do its assessment.  (Volna Dep. at 57-8.)  Volna specifically asked Gallagher for its observations and suggestions regarding the Risk Management department's "efficient and effective use of its resources and staffing to provide adequate coverage across the broad array of risks and insurance programs they are responsible for."  (Volna Dep. at 64; Slovut Aff. ¶ 7, Ex. F.)  Gallagher reported back, in a letter dated March 21, 2008, that the two workers' compensation employees:

> are somewhat redundant in their activities and they spend a great deal of their time doing work that would be more efficiently handled by the TPA. Examples include both reviewing the claims, one or the other notifying the TPA, and both keeping separate files for specific claims.

(Slovut Aff. ¶ 8, Ex. G.)  Gallagher indicated that the third-party administrator was "underutilized for the amount of the fee-for-service paid and when compared to how other entities typically utilize their [third-party administrators]."  (*Id*.)  Further, Gallagher suggested a reorganization of the department, including eliminating the Director of

Workers' Compensation position and redistributing the funding that existed for that position to create a new position of Risk Analyst. (*Id*.)[2]

Steven Pardoe started as the new Director of Risk Management on March 31, 2008. (Pardoe Dep. at 5.) Having reviewed the Gallagher recommendation and observing the department himself, Pardoe decided to reorganize the department. (*Id*. at 42-3.) Pardoe decided to eliminate Teachout's position and create a new Associate Director position that could provide backup to Volna and Seck with other Risk Management functions. (*Id*. at 71.) Pardoe notified Teachout that his position would be eliminated on May 28, 2008. (*Id*. at 57.)

Under the reorganization, both Teachout and his assistant's positions were eliminated, but the assistant ultimately was given a new position under Pardoe's supervision. (Pardoe Dep. at 32-33.) The new Associate Director position that was created allocated only 15% of its time to overseeing and monitoring the workers' compensation/liability claims' third-party administrator. (Slovut Aff. ¶ 9, Ex. H.)

**Teachout's Complaints and Request for Accommodation**

Teachout asserts that while that he was employed in Risk Management, he reported violations of the law to his supervisors, the Office of Compliance, and the General Counsel's Office regarding his department's alleged failure to keep confidential the medical records of injured University employees. Teachout's complaints are

---

[2] As noted above, in a letter to Mike Volna dated January 11, 2006, the previous Director of Risk Management recommended reducing the worker's compensation staff down to one employee. (Slovut Aff. ¶6, Ex. E.)

5

documented in the record beginning in January 2008.  (*See* Schermer Aff. Exs. 17, 18, 23.)  Teachout contends that he was retaliated against for reporting his confidentiality concerns.

Teachout testified that he notified Seck that he felt that the University was violating state and federal privacy laws because unauthorized people (who were not part of the Workers' Compensation Department) were given personal information on injured employees during meetings held to discuss specific workers' compensation claims.  (Teachout Dep. at 29-44.)  Seck invited a Human Resources representative, a Gallagher representative, an employee benefits representative, a representative from the environmental health and safety department, and a representative from Disability Services to these meetings.  (Teachout Dep. at 21-32.)  Seck initially provided copies of workers' compensation files to all of the meeting participants and the files were reviewed one by one.  (*Id*. at 24.)  Teachout was concerned that these extra attendees did not have a reason to be at the meetings and that information was being disseminated to people who had no reason to know about it.  (*Id*. at 28-45.)  Even after Seck began collecting the information after the meetings ended, Teachout became concerned that the attendees were allowed to retain the notes that they had taken during the meetings.  (*Id*. at 34-36.)  Teachout noted that it was "[p]art of [his] job to make sure the documents are handled properly" and that is why he voiced his concerns to Seck.  (*Id*. at 36.)  Teachout testified that he expressed his concerns as to the handling of this information after every one of these meetings.  (*Id*. at 39.)

Teachout also complained that medical records were not being kept in a secure location and that the University was failing to maintain the confidentiality of such records. It appears that at some point, records of past workers' compensation claims were moved out of a secured area and Teachout complained to his previous supervisor (Cary Jones), Seck, and Volna. (*Id*. at 54, 57-58.) Teachout further reported that it would violate statutory retention requirements for the University to destroy certain compensation records. (Teachout Dep. at 48-58; Schermer Aff. Exs. 12, 13.) Teachout specifically points to e-mail conversations between Volna and Susan McKinney, the University's Director of Records & Information Management, wherein Volna told McKinney about his retention discussions with Teachout. (Schermer Aff. Exs. 12, 13.) In support of his claims of retaliation, Teachout points to one e-mail wherein Volna expressed concerns that Teachout wanted too many records retained. (*Id*. at Ex. 13.) In that e-mail, Volna indicated that Teachout was "more than cautious; he is problematic . . . ." (*Id*. at Ex. 12.) Moreover, Teachout points to notes taken during a meeting with Seck, Volna, and Teachout where it was written that Teachout was "paranoid about talking w/in the office." (*Id*. at Ex. 21.)

In addition, Teachout complained about the move of the workers' compensation offices to unsecured open cubicles. (Teachout Dep. at 60.) After the move, Teachout raised concerns about the confidentiality of workers' compensation records because the fax machine (which received medical records and personnel information) was moved to an open cubicle. (*Id*.) Teachout also reported that because he and the other workers' compensation employee were situated in open cubicles, their telephone conversations

7

about private and confidential information could easily be overheard by unauthorized people. (*Id*. at 61.)

Teachout further contends that in January 2008, he reported to Seck that the third party administrator Sedgwick was engaging in illegal activity by paying kickbacks to vendors. (Schermer Aff. Ex. 14; Teachout Dep. at 107-110.) Teachout contends that it was within ten days of this report that his office was relocated into an open cubicle.

Teachout also points to Volna and Seck's discussions with Pardoe after Pardoe was hired regarding Teachout's reports of violations of confidentiality laws. (Pardoe Dep. at 36-39; Seck Dep. at 94-95.) Pardoe testified that at this time, either Volna or Seck reported to him that Teachout had raised concerns that the confidentiality of records was being compromised. (Pardoe Dep. at 36-39.)

Finally, Teachout asserts that his job classification was changed from executive to clerical without notifying him, and that this re-classification resulted in his inability to get a raise. (Schermer Aff. Ex. 31.) Teachout alleges that when he attempted to fix this matter in July 2007, Seck refused to reclassify him. Seck testified that it was a "central HR function of the University" to change Teachout's job classification. (Seck Dep. at 79.) Seck ultimately notified Volna on February 20, 2008, that she did not think that the job description appropriately reflected Teachout's current position. (Schermer Aff. Ex. 19.) Teachout points out that this occurred one day after he reported that his move to an open cubicle violated University policy. (*Id*. Ex. 18.)

In early May 2008, prior to being given notice of his termination, Teachout notified Dave Fuecker of the University's Office of Disability Services that his diagnosed

depression and panic anxiety attacks were impacting his job performance. (Teachout Dep. at 135-36.) Teachout requested that the University accommodate his disability by moving him to a private office from his cubicle.

The University contends that although Teachout complained about the move to an open cubicle both before and after it was made, the first time Teachout claimed that he needed a private office because of his disability was at a meeting with Fuecker on May 5, 2008. Although Teachout testified that he "possibly" may have met with someone in Disability Services 30 days prior to the May 5, 2008 meeting, Teachout also testified that he did not recall having told anyone of his history of depression or anxiety before he went to Disability Services in May 2008. (Teachout Dep. at 141-43.)

Disability Services communicated the accommodation request to Pardoe and, at the end of May 2008, Teachout was offered a private office for his last month of employment. However, Teachout never appeared for work during this last month. (Teachout Dep. 161-62.)

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**I.     ADA/MHRA Claims**

Teachout asserts that he was terminated from his position with the University in retaliation for his request for a disability accommodation in violation of the ADA and the MHRA.[3] The University asserts that Teachout's MHRA claim is barred by Eleventh

---

[3] Although the Complaint characterizes Teachout's claim as that of "disability discrimination," and alleges that Teachout requested but was denied a reasonable accommodation for his disability, the record does not support such an assertion. Teachout's testimony itself recognizes that once he told the University of his depression and anxiety, the University promptly offered him a private office to accommodate his alleged disability. (Teachout Dep. at 159-161.) Teachout quit working before he could take the University up on their offer. (*Id.*) Thus, even if Teachout's depression and anxiety were a disability as recognized by the ADA and MHRA (which the Court seriously questions, but the University does not dispute here), the University sufficiently accommodated the alleged disability.

Moreover, even if the Court were to consider this a disability discrimination case in the traditional sense, Teachout's claim would fail. Teachout has not provided the
(Footnote Continued on Next Page)

Amendment immunity. Further, the University contends that the ADA claim—and the MHRA claim, if not barred by Eleventh Amendment immunity—fail on the merits.

The Eleventh Amendment immunizes states from suits filed against them without their consent. The Supreme Court has construed the Eleventh Amendment, which by its express terms applies only to actions against states by citizens of other states, to also bar suits in federal court against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The immunity afforded a state in federal court extends to the University of Minnesota. *Treleven v. University of Minnesota*, 73 F.3d 816 (8th Cir. 1996). As such, this Court lacks jurisdiction over Teachout's state law MHRA claim. The Court finds no merit to Teachout's assertion that the University waived its right to bring an Eleventh Amendment defense to the MHRA claim by failing to raise the issue until this stage of the proceedings. The University's Answer merely stated that the University "does not dispute jurisdiction at this time." (Doc. No. 2 ¶ 6.) In addition, the University included an affirmative defense that Teachout's claims were barred by "other statutory or common law immunities that may be applicable." (*Id*. at 7, ¶ 8.) Thus, the University did not waive its Eleventh Amendment immunity defense.

Because the same burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies to the MHRA claim as to Teachout's ADA

---

(Footnote Continued From Previous Page)
Court with any direct evidence of discriminatory conduct and his assertion of temporal proximity, alone, is not sufficient to establish pretext. *See Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 916 (8th Cir. 2006). As a result, the Court will only address Teachout's ADA and MHRA claim insofar as it alleges that the University terminated his employment in retaliation for his request for an accommodation of his disability.

claim, the Court will address the MHRA claim on the merits as well.  *Burchett v. Target Corp.*, 340 F.3d 510, 516 (8th Cir. 2003); *see also Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n.4 (8th Cir. 2007) (explaining that federal precedent may be used to construe the MHRA).

Under this analytical framework, the employee bears the initial burden of proving a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  To make out a *prima facie* case of retaliation, Teachout must demonstrate that (1) he engaged in statutorily-protected conduct; (2) the University took an adverse employment action against him; and (3) a causal connection exists between the two events.  *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007).  If Teachout establishes a *prima facie* case, the burden of production shifts to the University to show a legitimate, nondiscriminatory reason for its action.  Then, Teachout must establish that the proffered nondiscriminatory reason was mere pretext for discrimination.  *Id*.

Here, Teachout cannot establish a causal link between his request for accommodation and the University's decision to terminate his employment.  The record clearly demonstrates that the plan to reorganize the department pre-dates Teachout's request for an accommodation in May 2008.  Gallagher recommended the reorganization in March 2008 and the re-organization was discussed between Cary Jones and Volna as early as January 2006.

Moreover, the University had legitimate, nondiscriminatory reasons for its action in laying off Teachout, and Teachout cannot establish pretext.  The University has set forth evidence that it needed an associate director with a broader range of risk

12

management skills and that Teachout's work was duplicative of that being performed by the third-party administrator. Gallagher, the outside consultant, came to a similar conclusion to reorganize the department prior to Teachout making his request for accommodation. These discussions on reorganization well preceded Teachout's request for accommodation. Teachout raises a lot of irrelevant facts, none of which are connected to his allegations that the real reasons behind the reorganization were discrimination based on his disability—or retaliation for his request for accommodation. As such, Teachout has failed to meet his burden to demonstrate pretext and his ADA, MHRA, and retaliation claims fail.

## II.     Whistleblower Claim

Teachout alleges that he was terminated in retaliation for his reports of conduct of the University that he believed to violate state laws and regulations, and that this termination violated the Minnesota Whistleblower Act, Minn. Stat. § 181.932, *et seq*. Similar to this Court's ruling above regarding the MHRA claim, the Court finds that Eleventh Amendment immunity immunizes the University from suit on this state law claim. However, the Court will also address the claim on the merits.

The Minnesota Whistleblower statute protects an employee from discharge or other retaliation when the "employee . . . in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer . . . ." Minn. Stat. § 181.932, subd. 1(1). Minnesota courts apply the same *McDonnell Douglas* burden shifting analysis as noted above for retaliation claims to claims filed under the

13

whistleblower statute.  *Cokley v. City of Otsego*, 623, N.W.2d 625, 630 (Minn. Ct. App. 2001).

In support of his Whistleblower claim, Teachout points to his "refusal to pay the fees that were incurred by the third party administrator that had not been approved by the University as it violated the contract . . . ."  (Pl.'s Mem. in Opp. at 37.)  Teachout does not tie this allegation to a violation of state or federal law or rule or regulation, nor has he established any causal connection between this refusal to pay fees on a contract and his termination.

Moreover, Teachout has not established a Whistleblower claim regarding the alleged breaches of confidentiality.  Teachout points to his reports regarding the unauthorized dissemination of employee medical records to people who did not have a need to know the information, his reports regarding the destruction of records, and his reports regarding employee confidentiality and his open cubicle.  But Teachout testified that a duty of his job was to insure that privacy laws were followed with respect to workers' compensation records.  (Teachout Dep. at 164.)  Teachout also testified that he believed that it was his responsibility as director of workers' compensation to make sure that the confidentiality of workers' compensation records were maintained.  (*Id*. at 78.)  Because these responsibilities fell within the scope of Teachout's normally assigned job duties, Teachout's reports are not actionable under Minnesota law.  *See Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220, 226-29 (Minn. 2010).

Finally, even if Teachout could meet the *prima facie* case, Teachout has not produced any evidence of pretext to rebut the University's legitimate, non-retaliatory reason for its action. For all of these reasons, Teachout's Whistleblower claim fails.

Therefore, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment (Doc. No. [9]) is **GRANTED.**

2. The Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 16, 2011                     s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge